**F I L E D**
CLERK, U.S. DISTRICT COURT

7/10/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ asi _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2025 Grand Jury

| UNITED STATES OF AMERICA, | CR 2:25-cr-00573-AH |
|---|---|
| Plaintiff, | I N D I C T M E N T |
| v. | [50 U.S.C. §§ 1705(a) and (c): Conspiracy to Violate the International Emergency Economic Powers Act; 50 U.S.C. §§ 1705(a) and (c): Violation of the International Emergency Economic Powers Act; 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c): Criminal Forfeiture] |
| BAHRAM MOHAMMAD OSTOVARI, | |
| Defendant. | |

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

At all times relevant to this Indictment, unless otherwise indicated:

I.   <u>The Defendant and the Relevant Entities</u>

1.   Defendant BAHRAM MOHAMMAD OSTOVARI ("OSTOVARI") was an Iranian national and, beginning on May 11, 2020, a lawful permanent resident of the United States.

2.   Company A was a railway signaling and communications systems engineering firm based in Tehran, Iran.  Company A, which

defendant OSTOVARI founded in or around 1986, had one of the largest mass transit project management portfolios in Iran and was responsible for helping to develop metro and light rail systems in Tehran, Esfahan, and other Iranian cities.

3.    MH-SYS FZCO ("MH-SYS") was a reseller of railway signaling and communications systems equipment based in the Jebel Ali Free Zone in Dubai, United Arab Emirates ("UAE").  Defendant OSTOVARI founded MH-SYS in 2003, and was MH-SYS's Managing Director and controlling shareholder.

4.    Match Systech FZE ("Match Systech") was an entity incorporated in Dubai, UAE, in or about April 2019.  Defendant OSTOVARI operated and controlled Match Systech.

5.    MH-SYS and Match Systech were front companies and alter ego companies used by OSTOVARI to procure U.S.-origin electronics and electrical components, including U.S. export-controlled items and other U.S.-origin items, on behalf of Company A in Iran.

II.    Relevant Statutory and Regulatory Background

    A.    The International Emergency Economic Powers Act and the Iranian Transactions and Sanctions Regulations

6.    The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701, et seq., granted the President of the United States the authority to deal with unusual and extraordinary threats to the national security, foreign policy, or economy of the United States. Pursuant to that authority, the President could declare a national emergency through Executive Orders that had the full force and effect of law.

7.    Under IEEPA, it was a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any order,

license, regulation, or prohibition issued pursuant to the statute. 50 U.S.C. § 1705(a). Pursuant to Section 1705(c), any person who willfully committed, attempted to commit, conspired to commit, or aided and abetted the commission of any unlawful act as described in 50 U.S.C. § 1705(a) of the statute was guilty of a crime.

8.   On March 15, 1995, the President issued Executive Order 12,957, which found that the actions and policies of the government of Iran constituted an unusual and extraordinary threat and declared a national emergency under IEEPA to deal with that threat. 60 Fed. Reg. 14,615 (Mar. 17, 1995). In two subsequent Executive Orders in 1995 and 1997, the President imposed comprehensive sanctions on Iran and clarified the original declaration of a national emergency. See Exec. Order No. 13,059, 62 Fed. Reg. 44,531 (Aug. 21, 1997); Exec. Order No. 12,959, 60 Fed. Reg. 24,757 (May 9, 1995). Since 1997, the President has continued the national emergency with respect to Iran and the 1995 and 1997 Executive Orders. The most recent continuation of this national emergency was on or about March 7, 2025.

9.   To respond to the national emergency with respect to Iran, the Secretary of the Treasury, through the Office of Foreign Assets Control ("OFAC"), issued the Iranian Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. Part 560. Absent permission from OFAC in the form of a license, the ITSR prohibited, among other things:

a.   The exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a U.S. person, wherever located, of any goods, technology, or services to Iran or the Government of Iran, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in

3

a third country with knowledge or reason to know that such goods, technology, or services were intended specifically for supply, trans-shipment, or reexportation, directly or indirectly, to Iran or the Government of Iran (31 C.F.R. § 560.204);

b.    The reexportation from a third country, directly or indirectly, by a person other than a U.S. person, of any goods, technology, or services that have been exported from the United States, if (a) such reexportation was undertaken with knowledge or reason to know that the reexportation is intended specifically for Iran or the Government of Iran; and (b) the exportation of such goods, technology, or services was subject to export license application requirements under any regulations (31 C.F.R. § 560.205);

c.    Any transaction by a U.S. person, wherever located, involving goods, technology, or services for exportation, reexportation, sale, or supply, directly or indirectly, to Iran or the Government of Iran (31 C.F.R. § 560.206); and

d.    Any transaction by a U.S. person or within the United States that evaded or avoided, had the purpose of evading or avoiding, or attempted to violate, any of the prohibitions in the ITSR (31 C.F.R. § 560.203).

10.    The term "U.S. person" means "any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States."  31 C.F.R. § 560.314.

B.    The Export Administration Regulations

11.    The Export Administration Regulations ("EAR"), 15 C.F.R. Parts 730-774, which were promulgated by the U.S. Department of

4

Commerce ("DOC"), Bureau of Industry and Security ("BIS"), regulated the export of goods, technology, and software from the United States.

12. Through the EAR, BIS reviewed and controlled the export of certain items from the United States to foreign countries. See 15 C.F.R. §§ 734.2, 734.3. BIS placed restrictions on the export and reexport of items that it determined could make a significant contribution to the military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States. Under the EAR, such restrictions depended on several factors, including the destination country, the end user, and the end use of the item.

13. The most sensitive items subject to the EAR controls were identified on the Commerce Control List ("CCL"), set forth in Title 15, Code of Federal Regulations, Part 774, Supplement Number 1. Items listed on the CCL were categorized by Export Control Classification Number ("ECCN"), each of which was subject to export control requirements depending on destination, end use, and end user of the item. Items that are not on the CCL, but remain subject to the EAR, were designated as EAR99 and required a valid BIS export authorization (i.e., a license or license exception) if intended to be exported or re-exported to an end-user in Iran.

14. Federal law required that exporters or their authorized agents submit an Electronic Export Information ("EEI") filing through the Automated Export System ("AES") for every export of goods from the United States with a value of over $2,500. An EEI also was required regardless of the value of the goods if the goods required an export license. A material part of the EEI and AES, as well as other export filings, was information concerning the end user and

ultimate destination of the export.  Failure to make an EEI filing or providing false or misleading information on an EEI filing in the AES was a violation of 13 U.S.C. § 305.

III. Overview of the Criminal Scheme

15.  Beginning at least in or around May 2018, and continuing through the date of this Indictment, defendant OSTOVARI conspired with persons known and unknown to the Grand Jury to devise and execute a scheme to procure electronics and electrical components, including U.S. export-controlled items, on behalf of Company A in Iran.  Defendant's co-conspirators included an MH-SYS procurement executive and Match Systech employee ("Co-Conspirator 1"), an MH-SYS employee ("Co-Conspirator 2"), and a Match Systech employee ("Co-Conspirator 3"), whose identities are known to the Grand Jury.

16.  Defendant OSTOVARI and his co-conspirators used MH-SYS and Match Systech in the UAE to acquire electronics and electrical components and then transship these items from the UAE to Company A in Iran.

17.  The items defendant OSTOVARI and his co-conspirators procured and transshipped to Iran included sophisticated computer processors and railway signaling equipment.  Many of these items were controlled under the EAR, and their export to Iran without a license was prohibited under the EAR and ITSR.

18.  After defendant OSTOVARI became a lawful permanent resident of the United States in May 2020, defendant OSTOVARI continued to export, reexport, sell, and supply electronics and electrical components to Company A in Iran.  Defendant OSTOVARI also continued to own, operate, and control Company A in Iran.

19.  Defendant OSTOVARI and his co-conspirators were aware of the U.S. sanctions on Iran.  For example:

a.  On September 10, 2019, in response to an inquiry from a UAE-based financial institution, defendant OSTOVARI sent a signed letter to the financial institution stating, "This is to confirm that MH SYS FZCO has no connection directly/indirectly with [Company A] based in Iran.  As we are aware of all sanction regulation and we are not dealing with any of the sanction countries."

b.  On May 5, 2020, defendant OSTOVARI directed Co-Conspirator 2 to provide false information to a BIS export control officer regarding the end user of U.S.-origin goods.

c.  On June 11, 2020, Co-Conspirator 2 forwarded an email from MH-SYS's auditors to defendant OSTOVARI, informing defendant OSTOVARI that the accounting firm could not complete MH-SYS's audit "due to the sanctions and restrictions that we are facing to work with entities which are dealing with Iran."  The auditors noted that there were "transactions and balances in the books of MH-Sys with [Company A], which is [an] Iran based company."

20.  At no time did defendant OSTOVARI, Company A, MH-SYS, or Match Systech apply for or obtain authorization or a license from OFAC to export, reexport, sell, or supply goods and technologies from the United States to Iran or to the Government of Iran.

//

//

COUNT ONE

[50 U.S.C. §§ 1705(a), (c);

31 C.F.R. §§ 560.203, 560.204, 560.205, and 560.206]

21.  The Grand Jury incorporates and realleges the allegations set forth in paragraphs 1 through 17 above, as if fully set forth herein.

22.  Beginning on an unknown date but no later than May 2018, and continuing to the date of this Indictment, in Los Angeles County, within the Central District of California, the United Arab Emirates, Iran, and elsewhere, defendant BAHRAM MOHAMMAD OSTOVARI ("OSTOVARI"), who is expected to be arrested in the Central District of California, and others known and unknown to the Grand Jury, knowingly and willfully conspired to violate the International Emergency Economic Powers Act ("IEEPA"), namely:

        a.   To knowingly and willfully export, reexport, sell, supply, and cause to be exported goods and technology from the United States to Iran, and by a United States person, wherever located, to Iran, directly and indirectly, including through the United Arab Emirates, without first having obtained authorization or the required license from the United States Department of Treasury's Office of Foreign Assets Control, in violation 50 U.S.C. § 1705(a) and (c), and 31 C.F.R. § 560.204;

        b.   To knowingly and willfully reexport goods and technology from a third country to Iran, directly or indirectly, by a person other than a U.S. person, goods and technology that have been exported from the United States, without first having obtained authorization or the required license from the United States

Department of Treasury's Office of Foreign Assets Control, in violation 50 U.S.C. § 1705(a) and (c), and 31 C.F.R. § 560.205;

c. To engage in a transaction by a United States person, wherever located, involving goods and technology for exportation, reexportation, sale, and supply, directly or indirectly, to Iran or the Government of Iran, including through the United Arab Emirates, in violation of 50 U.S.C. § 1705(a) and (c), and 31 C.F.R. § (31 C.F.R. § 560.206); and

d. To knowingly and willfully enter into transactions within the United States that evaded and avoided, and had the purpose of evading the regulations governing trade and exports from the United States to Iran, and by a United States person, wherever located, to Iran, in violation of 50 U.S.C. § 1705(a) and (c), and 31 C.F.R. § 560.203.

I.    OBJECTS OF THE CONSPIRACY

23.    The objects of the conspiracy were:

a. To acquire electronics and electrical components, including U.S. export-controlled items and other U.S.-origin items, on behalf of Company A and other end users in Iran;

b. To export, reexport, sell and supply electronics and electrical components, including U.S. export-controlled items, from the United States to Iran, directly and indirectly, including through the UAE;

c. To evade the prohibitions and licensing requirements of IEEPA and the ITSR; and

d. To profit from these illegal activities.

II.  <u>MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE
     ACCOMPLISHED</u>

     24.  The objects of the conspiracy were to be accomplished in substance as follows:

          a.  Company A would secure contracts to supply signaling and communications systems to Iran and the Government of Iran, including on projects for the Islamic Republic of Iran Railways, the Tehran Urban and Suburban Railway Company, and the Esfahan urban railway.

          b.  Defendant OSTOVARI would direct MH-SYS and Match Systech employees, including Co-Conspirator 1, Co-Conspirator 2, and Co-Conspirator 3, to acquire electronics and electrical components, including U.S. export-controlled items and other U.S.-origin items, for Company A in Iran.

          c.  Defendant OSTOVARI would direct MH-SYS and Match Systech employees, including Co-Conspirator 1, Co-Conspirator 2, and Co-Conspirator 3, to transship electronics and electrical components, including U.S. export-controlled items and other U.S.-origin items, from MH-SYS and Match Systech in the UAE to Company A in Iran.

          d.  Defendant OSTOVARI and his co-conspirators would intentionally conceal from companies located in the United States and elsewhere the true identities of the ultimate end users of the electronics and electrical components by providing false and misleading information about the ultimate end users.

III. <u>OVERT ACTS</u>

     25.  In furtherance of the conspiracy and to accomplish its objects, on or about the following dates, defendant OSTOVARI, and others known and unknown to the Grand Jury, committed and caused to

1    be committed various overt acts, including but not limited to the
2    following:

3        A.    Export of Microcontroller Development Kits from the United
                States to Company A in Iran
4

5        Overt Act No. 1:    On or about May 25, 2018, Co-Conspirator 1
6    submitted a purchase order on behalf of MH-SYS in the UAE for three
7    development kits for high-performance automotive-grade
8    microcontrollers (part number TMDX570LC43HDK) to a U.S. semiconductor
9    manufacturing company headquartered in Fort Worth, Texas ("U.S.
10   Company 1"), an entity the identity of which is known to the Grand
11   Jury.

12       Overt Act No. 2:    According to an EEI filing by U.S. Company 1
13   based on information provided by Co-Conspirator 1, MH-SYS was the
14   ultimate consignee of the microcontroller development kits.

15       Overt Act No. 3:    On June 10, 2018, Co-Conspirator 1 sent a
16   commercial invoice and packing list to an employee of Company A,
17   which reflected that MH-SYS had sent the three microcontroller
18   development kits "by passenger" from the UAE to Company A in Iran on
19   or about June 7, 2018.

20       B.    Export of Radio-Frequency Amplifier Module from the United
                States to Company A in Iran
21

22       Overt Act No. 4:    On December 17, 2018, Co-Conspirator 1
23   placed an order on MH-SYS's behalf for a radio frequency ("RF")
24   amplifier module, identified by part number KMA1040M2, from a company
25   headquartered in Washington State ("U.S. Company 2"), an entity the
26   identity of which is known to the Grand Jury.

27

28

                                      11

1    <u>Overt Act No. 5:</u>    On December 18, 2018, Co-Conspirator 1 sent

2    U.S. Company 2 a signed End-User Certification, which falsely stated

3    that MH-SYS was the end user of the RF amplifier module.

4    <u>Overt Act No. 6:</u>    The invoice for the RF amplifier module

5    contained the following warning: "These commodities are authorized by

6    the U.S. Government for export only to[]United Arab Emirates" and

7    "may not be transferred, transshipped, or otherwise disposed of in

8    any other country, either in their original form or after being

9    incorporated into other end-items, without prior approval of the

10    relevant U.S. government agency."

11    <u>Overt Act No. 7:</u>    On January 27, 2019, Co-Conspirator 1 sent

12    defendant OSTOVARI a commercial invoice and packing list, which

13    reflected that MH-SYS had shipped the RF amplifier module and other

14    goods "by passenger" to Company A in Iran on January 24, 2019.  The

15    commercial invoice, which was on MH-SYS letterhead and addressed to

16    Company A in Tehran, Iran, listed an RF amplifier module with part

17    number KMA1040M2.

18    C.    <u>Defendant OSTOVARI Instructed Co-Conspirator 2 to Withhold
       Information from and Provide False Information to an Export</u>
19     <u>Control Officer</u>

20    <u>Overt Act No. 8:</u>    On or about May 3, 2020, in response to an

21    inquiry from a BIS export control officer ("ECO") regarding whether

22    MH-SYS was the end user of the three microcontroller development kits

23    and the RF amplifier module, Co-Conspirator 2 asked the ECO to send

24    her the relevant documents via email so that she could speak with her

25    supervisor before responding.

26    <u>Overt Act No. 9:</u>    In an email on May 4, 2020, Co-Conspirator 2

27    asked defendant OSTOVARI to advise her on how to respond to the ECO.

28

1    Overt Act No. 10:   In an email on May 5, 2020, defendant
2    OSTOVARI directed Co-Conspirator 2 not to provide any substantive
3    information to the ECO, writing: "You should not give him any
4    information if he asks anything and just emphasize that you will
5    reply [to] the inquiry by email."  Defendant OSTOVARI also directed
6    Co-Conspirator 2 to tell the ECO that MH-SYS was "not active since
7    2019 because of economic crisis."

8    Overt Act No. 11:   On May 7, 2020, defendant OSTOVARI
9    instructed Co-Conspirator 2 via email to tell the ECO that the
10   microcontroller development kits and RF amplifier module were "only
11   samples for evaluation" and were "not sold," when in fact defendant
12   OSTOVARI knew that MH-SYS had exported the goods to Company A in Iran
13   on or about January 24, 2019.

14   Overt Act No. 12:   On May 7, 2020, Co-Conspirator 2 emailed
15   this false information to the ECO, per OSTOVARI's instructions
16   described in Overt Act 11, and Bcc'd defendant OSTOVARI on the email.

17   Overt Act No. 13:   In an email on May 7, 2020, defendant
18   OSTOVARI advised Co-Conspirator 2 that if the ECO asked to inspect
19   the items, Co-Conspirator 2 should reply that "we do not keep samples
20   for more than six months because of limit of space."

21   Overt Act No. 14:   On May 7, 2020, Co-Conspirator 2 relayed
22   this false information to the ECO via email, per OSTOVARI's
23   instructions described in Overt Act 13.

24       D.   March 2021 Shipment from MH-SYS in the UAE to Company A in
              Iran
25

26   Overt Act No. 15:   On May 25, 2020, Match Systech purchased 57
27   railway fanless touchscreen panel PCs (part number E22B710102),
28   containing Intel Atom E3845 processors, from a Taiwanese industrial

13

computer manufacturer ("Taiwanese Manufacturer 1"), an entity the identity of which is known to the Grand Jury, for $99,750.

Overt Act No. 16:   On June 30, 2020, Match Systech purchased another 93 railway fanless touchscreen panel PCs (part number E22B710102), containing Intel Atom E3845 processors, from Taiwanese Manufacturer 1 for $162,750.

Overt Act No. 17:   On August 27, 2020, defendant OSTOVARI instructed Co-Conspirator 1 to order 25 computer modules (part number E38D312100), containing Intel Atom x7-E3950 processors, from Taiwanese Manufacturer 1.  Taiwanese Manufacturer 1 shipped the 25 computer modules to Match Systech in the UAE on or about November 30, 2020

Overt Act No. 18:   On November 12, 2020, Co-Conspirator 2 sent defendant OSTOVARI a "signed and stamped" proforma invoice (PI-2021-1) from MH-SYS to Company A, which included the 150 railway fanless touchscreen panel PCs and the 25 computer modules.

Overt Act No. 19:   On January 25, 2021, defendant OSTOVARI instructed Co-Conspirator 2 to "[p]lease arrange the shipment" of invoice PI-2021-1 "by sea."

Overt Act No. 20:   On February 14, 2021, Co-Conspirator 2 sent an email to defendant OSTOVARI, attaching a commercial invoice, packing list, and delivery advice for a shipment from MH-SYS in the UAE to Company A in Iran.  The attached "Invoice & Packing List" from MH-SYS to Company A, dated February 7, 2021, included 150 items described as "Train Driver Panel Model: E22B710102" and 25 items described as "CPU Module E38D312100."  The attached "Delivery Advice" authorized the release of 11 pallets of goods from MH-SYS's warehouse

14

to Company A in Iran and indicated that the "exit point" of the goods was Jebel Ali, UAE, and their destination was Bandar Abbas, Iran.

Overt Act No. 21:    On February 17, 2021, Co-Conspirator 2 instructed a UAE freight forwarder to "proceed with the processing of our Shipment" of a "20ft. container" via sea cargo.  Co-Conspirator 1 attached the same "Invoice & Packing List" and "Delivery Advice" Co-Conspirator 2 sent to defendant OSTOVARI on February 14, 2021, as well as an export permit indicating that the end user was Company A in Tehran, Iran.

Overt Act No. 22:    On March 4, 2021, Co-Conspirator 2 informed defendant OSTOVARI via email that "our shipment departed already last 2nd March 2021" and attached a copy of the original shipping documents.  The bill of lading indicated that the shipment left Jebel Ali, UAE, to Bandar Abbas, Iran, on March 2, 2021, on the vessel "YEKTA-2"; that MH-SYS in Dubai, UAE, was the shipper; and that Company A in Tehran, Iran, was the consignee.  The packing list and commercial invoice showed that the shipment contained 150 units described as "Locomotive driver panel" and 25 units described as "Computer module Intel E3950-1.6 Ghz."

Overt Act No. 23:    On January 3, 2022, while defendant OSTOVARI was in the Central District of California, he emailed Co-Conspirator 1 to renew the lease for the office space used by MH-SYS.

E.    November 2024 Shipment of Intel Processors from MH-SYS in the UAE to Company A in Iran

Overt Act No. 24:    In February 2024, at defendant OSTOVARI's direction, Co-Conspirator 1 ordered 80 railway fanless touchscreen panel PCs (model number GOT710S-857-R-E3845), containing Intel Atom E3845 processors, from Taiwanese Manufacturer 1.

1        Overt Act No. 25:   On June 12, 2024, Co-Conspirator 1 sent

2   defendant OSTOVARI a proforma invoice from Match Systech to MH-SYS,

3   which included the 80 touchscreen panel PCs.  Co-Conspirator 1 noted

4   that the proforma invoice was revised "as per your instruction."

5        Overt Act No. 26:   On June 27, 2024, Co-Conspirator 1 sent

6   defendant OSTOVARI a proforma invoice from Match Systech to Company A

7   for the 80 touchscreen panel PCs and asked defendant OSTOVARI to

8   "[k]indly check and advise."  Co-Conspirator 2 sent a revised

9   proforma invoice (PI MST-PI245005) for 40 touchscreen panel PCs for

10  AED 546,000 to defendant OSTOVARI the following day.

11       Overt Act No. 27:   On September 3, 2024, while in the Central

12  District of California, defendant OSTOVARI emailed instructions to

13  Co-Conspirator 1 to draft a letter to account for the payment of cash

14  from Company A to Match Systech for the touchscreen panel PCs.  In

15  the email, with the subject line "PI MST-PI2425005 AED 546000,"

16  defendant OSTOVARI wrote, "Since you are supposed to receive the

17  amount of PI in cash, please send a letter similar" to an attached

18  example authorizing Co-Conspirator 1 to receive a cash payment in

19  Dubai.

20       Overt Act No. 28:   On September 19, 2024, Co-Conspirator 1

21  emailed defendant OSTOVARI, "We have received the cash payment of

22  AED546,000 of Proforma Invoice No. MST-PI2425005," and attached a

23  confirmatory letter from Match Systech to Company A.

24       Overt Act No. 29:   On October 15, 2024, defendant OSTOVARI

25  directed Co-Conspirator 1 to arrange the shipment of the touchscreen

26  panel PCs from the UAE to Iran.

27       Overt Act No. 30:   On November 4, 2024, Co-Conspirator 1

28  updated defendant OSTOVARI via email that the "shipment departed

16

yesterday" and attached the "original shipping documents."  The attached Air Waybill reflected a shipment of 40 railway fanless touchscreen panel PCs from Match Systech in the UAE to Company A in Iran via air freight.  The attached commercial invoice (MST-INV2425005) reflected that Match Systech had sold 40 touchscreen panel PCs to Company A in Iran on October 28, 2024, for AED 546,000.

Overt Act No. 31:  On November 7, 2024, Co-Conspirator 1 informed defendant OSTOVARI that "the 40pcs panel shipment under MST-PI2425005" was "now in IKA custom under flight no. W5-0062," referring to Imam Khomeini International Airport near Tehran, Iran, and a Mahan Air flight from Dubai to Tehran.  Co-Conspirator 1 noted that the "[o]riginal documents sent by courier" were "now out for delivery in Tehran."

F.  November 2024 Shipment of Power Supply Modules from MH-SYS in the UAE to Company A in Iran

Overt Act No. 32:  On March 3, 2024, Co-Conspirator 1 ordered 75 DC/DC regulated power supply modules (model number RSD-60H-24) on behalf of Match Systech from a U.S. electronics distributor headquartered in Massachusetts ("U.S. Company 3"), an entity the identity of which is known to the Grand Jury.  The invoice from U.S. Company 3 noted that the power supply modules were designated as EAR99 and stated that "[t]hese items are controlled by the U.S. Government and authorized for export only to the country of ultimate destination for use by the ultimate consignee or end-user(s) herein identified."

Overt Act No. 33:  On March 4, 2024, U.S. Company 3 shipped the power supply modules from Lewisville, Texas, to Match Systech in the UAE.

<u>Overt Act No. 34:</u>  On August 7, 2024, defendant OSTOVARI sent a copy of Proforma Invoice No. MST-PI2425009 from Match Systech in the UAE to Company A in Iran from his MH-SYS email address to his Company A email address.  The invoice included 75 units identified as "Power Supply RSD-60H-24," corresponding to the parts purchased from U.S. Company 3.

<u>Overt Act No. 35:</u>  On October 14, 2024, Co-Conspirator 1 sent defendant OSTOVARI a "letter of payment" regarding Proforma Invoice No. MST-PI2425009.  The letter of payment from Match Systech in the UAE to Company A in Iran authorized Co-Conspirator 3 to receive a cash payment of AED 550,000 from Company A for Proforma Invoice No. MST-PI2425009.

<u>Overt Act No. 36:</u>  On October 15, 2024, defendant OSTOVARI directed Co-Conspirator 1 to arrange the shipment of Proforma Invoice No. MST-PI2425009.

<u>Overt Act No. 37:</u>  On November 21, 2024, Co-Conspirator 1 sent defendant OSTOVARI a daily report stating, "Sir, Components shipment has been collected.  Vessel will depart on Monday."  Co-Conspirator 1 noted that AED 450,000 of the AED 550,000 payment had been deposited in Match Systech's bank accounts.

<u>Overt Act No. 38:</u>  On November 26, 2024, Co-Conspirator 1 sent defendant OSTOVARI a copy of the "original shipping documents" for the 75 power supply modules, noting that the "shipment by sea departed yesterday."  The attached bill of lading showed that Match Systech had shipped 27 boxes containing "electrical spare parts," weighing 441 kilograms, by sea from Jebel Ali, UAE, to Bandar Abbas, Iran, on November 23, 2024.  The bill of lading listed Company A in Tehran, Iran, as the ultimate consignee of the shipment.  The

1  attached commercial invoice included 75 power supply modules

2  identified as "Power Supply RSD-60H-24."

3  //

4  //

COUNT TWO

[50 U.S.C. §§ 1705(a), (c);

31 C.F.R. §§ 560.204 and 560.206; 18 U.S.C. §§ 2(a), (b)]

26.  The Grand Jury incorporates and realleges the allegations set forth in paragraphs 1 through 17 above, as if fully set forth herein.

27.  On or about March 2, 2021, in an offense begun and committed out of the jurisdiction of any particular state or district of the United States, defendant BAHRAM MOHAMMAD OSTOVARI ("OSTOVARI"), who is expected to be arrested in the Central District of California, and others known and unknown, aiding and abetting each other, knowingly and willfully exported, reexported, sold, supplied, attempted to export, and caused to be exported goods and technology from the United States to Iran, and by a United States person, wherever located, to Iran, directly and indirectly, including through the United Arab Emirates, without first having obtained authorization or the required license from the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC").

28.  Specifically, defendant OSTOVARI, a United States person, exported, reexported, sold, supplied, attempted to export, and caused to be exported 25 computer modules containing Intel Atom x7-E3950 processors to Company A in Iran, without having obtained authorization or the required license from OFAC.

//

//

1

                              COUNT THREE

2                        [50 U.S.C. §§ 1705(a), (c);

3          31 C.F.R. §§ 560.204 and 560.206; 18 U.S.C. §§ 2(a), (b)]

4          29.  The Grand Jury incorporates and realleges the allegations

5    set forth in paragraphs 1 through 17 above, as if fully set forth

6    herein.

7          30.  On or about November 3, 2024, in Los Angeles County, within

8    the Central District of California, and elsewhere, in an offense

9    begun and committed out of the jurisdiction of any particular state

10   or district of the United States, defendant BAHRAM MOHAMMAD OSTOVARI

11   ("OSTOVARI"), who is expected to be arrested in the Central District

12   of California, and others known and unknown, aiding and abetting each

13   other, knowingly and willfully exported, reexported, sold, supplied,

14   attempted to export, and caused to be exported goods and technology

15   from the United States to Iran, and by a United States person,

16   wherever located, to Iran, directly and indirectly, including through

17   the United Arab Emirates, without first having obtained authorization

18   or the required license from the United States Department of the

19   Treasury's Office of Foreign Assets Control ("OFAC").

20         31.  Specifically, defendant OSTOVARI, a United States person,

21   exported, reexported, sold, supplied, attempted to export, and caused

22   to be exported 40 railway fanless touchscreen panel computers

23   containing Intel Atom E3845 processors to Company A in Iran, without

24   having obtained authorization or the required license from OFAC.

25   //

26   //

27

28

                                      21

COUNT FOUR

[50 U.S.C. §§ 1705(a), (c);

31 C.F.R. §§ 560.203, 560.204, 560.205, 560.206;

18 U.S.C. §§ 2(a), (b)]

32.   The Grand Jury incorporates and realleges the allegations set forth in paragraphs 1 through 17 above, as if fully set forth herein.

33.   On or about November 25, 2024, in Los Angeles County, within the Central District of California, and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular state or district of the United States, defendant BAHRAM MOHAMMAD OSTOVARI ("OSTOVARI"), who is expected to be arrested in the Central District of California, and others known and unknown, aiding and abetting each other, knowingly and willfully exported, reexported, sold, supplied, attempted to export, and caused to be exported goods and technology from the United States to Iran, and by a United States person, wherever located, to Iran, directly and indirectly, including through the United Arab Emirates, without first having obtained authorization or the required license from the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC").

34.   Specifically, defendant OSTOVARI, a United States person, exported, reexported, sold, supplied, attempted to export, and caused to be exported 75 power supply modules to Company A in Iran, without having obtained authorization or the required license from OFAC.

//

//

FORFEITURE ALLEGATION

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of the defendant's conviction of any of the offenses set forth in Counts One through Four of this Indictment.

2.    The defendant, if so convicted, shall forfeit to the United States of America the following:

       (a)   all right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to the offenses; and

       (b)   to the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the defendant, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party;

//

//

1  (c) has been placed beyond the jurisdiction of the court; (d) has

2  been substantially diminished in value; or (e) has been commingled

3  with other property that cannot be divided without difficulty.

4

5

6                                          A TRUE BILL

7

8                                          /S/
                                           _____
9                                          Foreperson

10  BILAL A. ESSAYLI
    United States Attorney
11

12

13

14  DAVID T. RYAN
    Assistant United States Attorney
15  Chief, National Security Division

16  IAN V. YANNIELLO
    Assistant United States Attorney
17  Chief, Terrorism and Export
    Crimes Section

18  DAVID C. LACHMAN
    Assistant United States Attorney
19  Terrorism and Export Crimes
    Section
20
    COLIN S. SCOTT
21  Assistant United States Attorney
    Terrorism and Export Crimes
22  Section

23

24

25

26

27

28